OPINION
{¶ 1} Defendant-appellant, Kevin A. Tolliver, appeals from a judgment of the Franklin County Court of Common Pleas convicting him of the murder of Claire Schneider. Defendant advances the following eight assignments of error:
[I.] The trial court erred in failing to suppress appellant's statements during his custodial interrogation where the statements were taken in violation of Miranda v. Arizona
(1966), 384 U.S. 436.
[II.] The conviction of the defendant was against the manifest weight of the evidence as there was insufficient evidence of a purposeful killing.
[III.] Defendant's fifth amendment rights were violated when the prosecution argued that defendant's invocation of his right to silence indicated that he was guilty. this violated defendant's rights as guaranteed by the fifth, sixth andfourteenth amendments under the U.S. constitution and article 2, § 2, 10 and 16 of the ohio constitution.
[IV.] The trial court erred and abused its discretion by allowing admission of the white shirt when there was an insufficient chain of custody and the shirt was more prejudicial than probative thereby denying defendant his rights to due process, and a fair trial under the state and federal constitutions.
[V.] A defendant is denied his rights to a fair trial, due process and a reliable determination of his guilt and sentence as guaranteed by the fifth, sixth, eighth and fourteenth amendments to the united states constitution and article I, sections 10 and16 of the ohio constitution when the prosecutor repeatedly engages in improper argument and other misconduct.
[VI.] The trial court erred and abused its discretion in refusing the defense access to claire schneider's diary, court exhibit 1, particularly after the prosecutor presented evidence in direct contrast to entries in the diary.
[VII.] The trial court erred and abused its discretion in failing to grant an evidentiary hearing on the motion for new trial.
[VIII]. A conviction must be reversed when the cumulative effect of errors deprives a defendant of his state and federal constitutional right to a fair trial.
 {¶ 2} On January 9, 2002, defendant was indicted by a Franklin County Grand Jury on one count of murder with a firearm specification, in violation of R.C. 2903.02 and 2941.145, respectively, and one count of tampering with evidence in violation of R.C. 2921.12. Prior to trial, defendant's motion to suppress statements made by defendant was denied. A jury trial commenced on June 3, 2002. Following opening statements, the court, on motion of defendant, dismissed the tampering with evidence count. The court's oral decision was reaffirmed in a subsequently filed written decision. After a three-week trial, the jury returned a verdict finding defendant guilty of murder with a firearm specification. The trial court sentenced defendant to 15 years to life on the murder charge, with an additional three years incarceration on the firearm specification. Thereafter, defendant filed a motion for judgment of acquittal or, in the alternative, motion for new trial, to which the state responded. By decision and entry filed August 13, 2002, the trial court denied defendant's motion without a hearing.
 {¶ 3} Claire Schneider began dating defendant in the fall of 1999. Defendant was divorced from his ex-wife, Natasha Tolliver, with whom he shared custody of their young daughter. Claire, a student at The Ohio State University ("OSU") and a part-time nail technician, moved into Apartment 120 in the Olentangy Village Apartment complex located at 100 North Street, Columbus, Ohio, in January 2001. Defendant began living with Claire in September 2001. Claire and defendant planned to move out of the apartment and into a house, once defendant's extensive remodeling of the house was completed in January 2002. Claire obtained a loan to purchase the house.
 {¶ 4} Claire had been accepted into OSU's Program in International Development and was scheduled to study in the Dominican Republic from January 5, 2002 to February 16, 2002. Defendant was scheduled to meet Claire in the Dominican Republic at the conclusion of the program and spend a week vacationing with her. Claire told both her father, Walter Schneider, and her friend and co-worker, Gail Isenberg Hayes, that she was excited about the upcoming trip. She never mentioned to either of them that she had any plans to marry defendant.
 {¶ 5} In August 2001, Claire went to Dr. Stanley McCloy complaining of sleeping difficulty, nightmares, panic attacks and an inability to concentrate. Dr. McCloy diagnosed moderate depression and prescribed Paxil. Pharmacy records indicated that Claire's Paxil prescription was last filled on November 24, 2001.
 {¶ 6} On December 28, 2001, Claire attended the closing on the house. Problems arose with some of the documentation, so the transaction was not completed.
 {¶ 7} Around 12:00 a.m. on December 29, 2001, Claire and defendant had drinks at a restaurant with a friend and later went to a nearby nightclub. At one point, Claire's co-worker, Abby Warner, noticed Claire and defendant dancing together; however, Warner later saw Claire dancing without defendant. Warner noticed that defendant was watching Claire as if he were angry.
 {¶ 8} Collin Bumgarner, the manager of the nightclub, saw defendant and Claire leave the nightclub and walk to defendant's vehicle. The couple attracted Bumgarner's attention because they were speaking loudly to one another; however, Bumgarner did not view the incident as alarming.
 {¶ 9} Defendant and Claire returned to the apartment at approximately 12:36 a.m. Approximately five minutes later, defendant, wearing a light-colored shirt, exited the apartment building and searched the parking lot with a flashlight. He returned to the building approximately four minutes later.
 {¶ 10} At 1:15 a.m., Janet Parady, who resided in Apartment 220, was awakened to a man screaming "No, No. Don't, don't. Oh, please. Please." (Vol. I, Tr. 76.) She called 911 and reported that she thought the screaming came from Apartment 320, the apartment directly above her. She further reported that the people who lived in apartment 320 had been fighting for approximately one-half hour, and that it sounded like someone had fallen down.
 {¶ 11} Columbus Police Officer David Shots responded to Parady's 911 call at 1:18 a.m. While he was in Parady's apartment, he heard a noise that sounded like "moaning or crying." (Vol. I, Tr. 139.) He could not determine what the sound was or where it originated, so he conducted no further investigation. Because Parady reported that the earlier disturbance came from Apartment 320, Shots proceeded there. In response to questioning by Shots, the occupants denied that any arguing or fighting had occurred.
 {¶ 12} At approximately 1:45 a.m., Natasha Tolliver received a telephone call from defendant. Defendant was sobbing and told Natasha that if she ever loved him, she would come to his apartment immediately. Natasha put her daughter in her car and drove to the apartment complex at approximately 1:55 a.m. When she arrived at defendant's apartment, she saw blood smeared on the front door. Defendant was dressed in a blood-stained bathrobe and had blood on his hands and legs. She also noticed blood on the living room wall and kitchen floor. Natasha told defendant she was going to take their daughter back to the car. Defendant followed her outside. When she asked defendant what had happened, he told her that he was "really in trouble." (Vol. XII, Tr. 1727.) Natasha told defendant to call the police. Defendant was crying so hysterically that Natasha thought he was having a breakdown. Defendant said he was going to kill himself and that he wanted to see his daughter. Natasha called 911 and reported what had happened. She then drove to the other side of the parking lot because she was afraid defendant might kill himself in front of their daughter.
 {¶ 13} Peter Kovarik, the resident of Apartment 215, returned to the apartment complex at approximately 2:00 a.m. As he walked inside the building, he noticed defendant, dressed in a bathrobe, standing in the hallway outside Apartment 117. Defendant seemed startled to see Kovarik and ducked into the alcove outside Apartment 117. Seconds later, defendant stepped out from the alcove and asked Kovarik "how's it going?" (Vol. I, Tr. 107.) In response, Kovarik asked defendant "how is it going with you?" Defendant responded "good." (Vol. I, Tr. 108.) According to Kovarik, defendant did not act as if he were upset about anything and did not ask him for assistance.
 {¶ 14} Officers Shots and Paul Coulter responded to Natasha's 911 call between 2:00 and 2:05 a.m. Natasha met the officers outside the building and reiterated what she had reported in her 911 call. Thereafter, the officers proceeded to defendant's apartment. Defendant emerged from the apartment, dressed only in a bathrobe. The bathrobe had blood on it, as did defendant's feet and legs. Defendant was talking on a cell phone (later determined to be Claire's) and holding a bloody dishtowel. Defendant told the officers, "[s]he shot herself." (Vol. I, Tr. 149.) According to both Shots and Coulter, the door to Apartment 117 had smeared blood on it, as if someone had tried to wipe blood off the door. There was also blood spatter on the door jamb of Apartment 117. Defendant was immediately handcuffed and placed in Shots' cruiser. Defendant said, "I can't believe she did this. She has only held a gun — she has never even held a gun." (Vol. I, Tr. 152.) Defendant then started to cry and said "her dad is going to be mad at me." Id. Defendant also averred that he could not find a telephone. Defendant ultimately fell asleep in the cruiser and was thereafter transported to the police station.
 {¶ 15} While searching the apartment, Officer Coulter found blood on the walls and floor, as well as on several items in the apartment. An overturned floor lamp and potted plant lay on the living room floor. Coulter discovered Claire's dead body lying face-up on the bathroom floor on top of a black nylon jacket. Her arms were partially inside the sleeves of the jacket, which was saturated with blood. A blood-covered 9mm Ruger semiautomatic pistol, an envelope containing $3, and a handwritten note were found on the vanity in the bathroom. The note said "she did not know gun was loaded. I loved her. Could not find the phone." (Vol. II, Tr. 308, State's Exhibits D120, D121, E12.) Inside the sink lay two live shells and the gun's magazine clip containing 12 live shells. The gun did not contain a live round in the chamber. The bathroom door contained a single bullet hole that had several strands of hair attached to it. A spent 9mm shell casing was found in the hallway just outside the bathroom. A spent 9mm bullet was found behind the door in the bathroom. Two pens and a semiautomatic weapon magazine clip containing live rounds of ammunition were found underneath Claire's body.
 {¶ 16} Columbus Police Detective Robert Viduya arrived at the scene after defendant was secured in the cruiser. Viduya instructed the transport officers not to allow defendant to go to the bathroom at the police station, so that blood evidence on defendant's body could be collected. Photographs taken of defendant at the police station show blood on defendant's face, legs and feet; however, no blood appears on defendant's hands.
 {¶ 17} A videotaped interview of defendant was conducted at the police station. The substance of the interview will be discussed below.
 {¶ 18} Columbus Police Crime Scene Search Unit Detectives Thomas Seevers and Mark Henson processed the scene on December 29, 30 and 31, 2001. Over the course of three days, 181 photographs were taken and 23 bags of evidence were collected. Seevers noted that that there was no land line telephone in the apartment. No fingerprint lifts were taken from the bullets found in the bathroom, nor was the gun checked for latent fingerprints. No gunshot residue analysis was performed on Claire because gunshot victims are assumed to have residue on them. No gunshot residue analysis was performed on defendant due to defendant's close proximity to Claire at the time of the shooting and because defendant said he had washed his hands. Two cell phones were recovered from defendant's vehicle, which was in the parking lot adjacent to the building. Claire's wallet was recovered from the parking lot.
 {¶ 19} After the police completed processing the scene, the locks on the apartment were changed. The only persons with keys to the apartment were apartment manager Molly Bringarner and maintenance supervisor Kenneth Smith. On January 7, 2002, two employees of Servpro, a biohazard cleanup company, were permitted entrance to clean the apartment of blood residue. An insurance claims representative was also permitted access to the apartment on January 7, 2002 to assess damage.
 {¶ 20} On January 9, 2002, Claire's stepmother, Amy Schneider, and Claire's aunt, Teresa Reid, went to the apartment to sort and pack items in preparation for removing them. While sorting through clothes in the master bedroom, Reid discovered a pair of men's black slacks with blood on the inside of one of the pockets lying on the floor, and a man's white dress shirt with blood on it near the bottom of a clothes hamper, underneath some other clothes. Because she assumed the police had retrieved everything they needed from the apartment, Reid placed the items in two separate garbage bags and left them in the apartment. Later that day, Reid informed Claire's father, Walter Schneider, of her discovery. After conferring with the police and one of the prosecutors, Mr. Schneider contacted Reid and asked her to meet him at the apartment the next day. Mr. Schneider retrieved the items from Reid when the two met at the apartment on January 10, 2002. While in the apartment, Mr. Schneider noticed blood on a pair of defendant's black boots; however, he did not retrieve the boots at that time. Mr. Schneider put the slacks and shirt in the back of his vehicle. On January 13, 2002, Mr. Schneider asked his son-in-law to retrieve the boots from the apartment. After the son-in-law retrieved the boots, Mr. Schneider stored the slacks, shirt and boots in the basement of his home. Later that evening, Mr. Schneider contacted the police. Detective Michael Cone retrieved the items from Mr. Schneider's residence and submitted them to the Columbus Police Department ("CPD") property room.
 {¶ 21} Keith Norton, forensic pathologist and deputy coroner at the Franklin County Coroner's office, performed an autopsy on Claire. During the autopsy, Norton discovered several contusions on Claire's legs and several small abrasions on the right side of her face near her mouth. He also discovered an abrasion and a contusion on the left side of Claire's neck which he estimated to be less than 48-hours old. He further discovered that the right side of Claire's lips were severely burned. There was no damage to Claire's front teeth, but several of the back teeth on the upper right side of Claire's mouth had been fractured. Based on the damage to Claire's teeth and lips, Norton determined that the bullet entered the corner of the right side of Claire's mouth, and that her mouth was open when the bullet entered. Norton could not visualize the entrance wound in the back of the mouth because it was so far back; however, he could see the exit wound in the back of the neck. Norton determined that the trajectory of the bullet was front to back, slightly left to right, and upward.
 {¶ 22} A toxicology screen of Claire's blood measured 0.16 grams of alcohol; no other drugs were found. Norton concluded that the cause of death was a loose contact wound to the head; however, he could not determine the manner of death, as it was unclear whether it was suicide or homicide. Norton found it unlikely that Claire's death was an accident due to the proximity of the gun to her mouth at the time the gun was discharged. According to Norton, it would have been an unusual form of suicide to have fired a weapon from outside the mouth into the mouth. He conceded, however, that Claire, who was left-handed, could have caused the wound if she held the gun in her left hand. He estimated that after sustaining the gunshot wound, Claire would have become unconscious within seconds and would have died within 30 minutes. He also reported that the autopsy findings were not inconsistent with cardiopulmonary resuscitation ("CPR") having been performed.
 {¶ 23} Columbus Police Criminalist Amoreena Clarkson performed a blood analysis of several items of evidence. Claire's blood was confirmed to be present on a dishtowel, gloves, paper towel, defendant's bathrobe, defendant's body, the magazine clip, white shirt, black slacks and black boots.
 {¶ 24} Columbus Police Detective and bloodstain expert Robert Young viewed the crime scene on December 30, 2001. He also reviewed photographs of the crime scene, laboratory reports, police reports, and defendant's statement. Young noted diluted blood droplets in the kitchen, which indicated that some cleanup effort had occurred. He also identified several blood transfer stains on Claire's body which Young opined were made by the repositioning of her body after her death. Young determined that Claire had been shot while standing in the bathroom and that the bullet passed through the bathroom door approximately 62 inches from the floor. He further determined that because the pen used to write the note discovered on the sink was found under Claire's body, defendant repositioned Claire's body on top of the pen after she was shot.
 {¶ 25} Young also noted 18 impact spatterings on the right forearm of the white shirt found in the clothes hamper. According to Young, the entrance wound in Claire's mouth produced high velocity back spatter, which landed on the right sleeve of the shirt, demonstrating that the shirt was in close proximity to Claire's face at the instant she was shot. Impact droplets in the button line on the front of the shirt indicated that the shirt was worn unbuttoned at the time of the spattering. Young candidly admitted that he did not think the shooting was a homicide until he saw photographs of the shirt. Young conceded that expirated blood from Claire's mouth or nose expelled during CPR might appear as high velocity spatter, but he did not believe that the bloodstains on the shirt were expirated. Young concurred in Norton's opinion that the fact that only Claire's back teeth sustained damage indicated that her mouth was open at the time she was shot. Young agreed that the blood spatterings found on the shirt are consistent with the theory that someone fired the gun with the left hand while holding Claire by the throat with the right hand. Young conceded, however, that the blood spatter evidence did not provide a direct indication of who fired the gun.
 {¶ 26} Columbus Police Criminalist and ballistics expert Mark Hardy examined both the shell casing and spent bullet found in the bathroom and determined that the bullet had been fired from the 9mm weapon found at the scene. Hardy further determined that the gun was capable of being fired without the magazine clip being inserted.
 {¶ 27} Hardy further determined that the gun was fired so close to Claire's mouth that the gasses projected out of the muzzle burned Claire's lips. Using a transparent overlay that showed the forward face of the gun, and placing that overlay over a photograph of the burned area on the right side of Claire's mouth, Hardy determined the orientation of the gun when it was fired. An unburned area on the right corner of Claire's mouth showed that the gun had been in contact with her mouth and that the recoil guide of the weapon had protected the corner of her mouth from the hot outgassing that otherwise burned her lips. Hardy determined that the gun was positioned on its side with the butt of the gun facing to the left; in other words, the gun was turned 90 degrees clockwise.
 {¶ 28} Defense bloodstain expert Stuart James determined that Claire was standing no more than 6 to 12 inches from the bathroom door when she was shot. With regard to the bloodstain spatters on the white shirt, James concluded that it was impossible to state with scientific certainty whether the spatters were produced by gunshot back spatter.
 {¶ 29} Claire's cell phone records demonstrate that between 1:29 and 2:15 a.m. on December 29, 2001, seven calls were made to Natasha Tolliver's cell phone, one call was made to Claire's cell phone, one call was made to defendant's cell phone, and one call was made to a friend of defendant.
 {¶ 30} While defendant was awaiting trial, he was confined with an inmate named Joseph Adams. After Adams discovered that defendant had been charged with murder, he decided to try to coerce defendant into revealing details about the murder so that he could then provide that information to the state in exchange for a reduction in his sentence. After Adams provided the information obtained from defendant, the state agreed to an eight-year reduction in Adams' 16-year sentence in exchange for his testimony. Adams testified that he obtained all the details about the murder from defendant and did not get any details from the prosecutor, the police, or television news.
 {¶ 31} According to Adams, defendant told him that Claire worked as a nail technician and that she was going to study in the Dominican Republic. Defendant said he did not want Claire to go to the Dominican Republic because he might lose her. He also told Adams that they were preparing to move into a house and that they were planning to get married in the Dominican Republic.
 {¶ 32} Adams testified that defendant initially told him that Claire was depressed and committed suicide by shooting herself in the chest. He later admitted that a discussion about her finalizing plans for her trip led him to kill her with a 9mm weapon. Defendant initially said that he did not call 911 immediately because he was in shock. However, he later confessed that he did not call 911 because he had to get rid of evidence, move the body to make it look like Claire killed herself, and get blood on himself to make it look like he had held her. Defendant also told Adams that his defense would be that Claire killed herself and he would look remorseful and cry in front of the jury so they would believe him.
 {¶ 33} An inmate incarcerated with defendant and Adams, David Dye, testified on behalf of defendant. According to Dye, Adams approached him prior to defendant's trial and asked him if he wanted to testify against defendant in order to "help myself (Dye) out." (Vol. XII, Tr. 1670.) Dye told Adams that he could not testify against defendant because he did not know anything about defendant's case. He further stated that although Adams never told him he had made up the story about defendant, Dye got the impression that Adams had done so.
 {¶ 34} As defendant's first and third assignments of error are interrelated, they will be combined for purposes of discussion. By the first assignment of error, defendant contends that the trial court erred in failing to suppress statements made by defendant during his custodial interrogation in violation of his rights as guaranteed by the Fifth, Sixth andFourteenth Amendments to the United States Constitution, as well as ArticleI, Section 10, Ohio Constitution. Defendant cites as authorityMiranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602;Edwards v. Arizona (1981), 451 U.S. 477, 101 S.Ct. 1880, and their progeny.
 {¶ 35} Defendant filed a motion to suppress "all statements made by the Defendant during his custodial interrogation on December 29, 2001." (Apr. 4, 2002 Motion to Suppress, at 1.) In response, the state conceded that defendant was in custody at the time the challenged statements were made, but argued (1) that defendant was never subjected to interrogation, and (2) that any questions asked by the police fell under the "booking exception" to Miranda. Accordingly, the state contended that Miranda
warnings were not required.
 {¶ 36} As previously noted, defendant was taken from the scene and transported directly to the police station. Defendant made several statements both prior to and during transport. Upon arrival at the police station, defendant was placed in an interview room where he was photographed and blood swabs were collected from his body. During this time period, defendant made several statements. The entire process was videotaped.
 {¶ 37} Prior to ruling on the motion, the trial court reviewed the videotape of the interview as well as separate transcripts of the interview provided by defendant and the state; no testimony or other evidence was considered. The trial court determined that all of defendant's statements were voluntary and not in response to interrogation by law enforcement officials. Accordingly, the court determined that defendant's statements were admissible to the point where defendant specifically named three attorneys. The court further indicated that before the videotape would be played for the jury, the court would confer with counsel for both defendant and the state regarding deleting certain portions of the videotape. The edited videotape was played for the jury without objection.
 {¶ 38} We begin our analysis from the premise that appellate review of a trial court's ruling on a motion to suppress presents mixed questions of law and fact. See State v. McNamara (1997),124 Ohio App.3d 706, 710. During proceedings on suppression motions, the trial court assumes the role of trier of fact.State v. Payne (1995), 104 Ohio App.3d 364, 367. Accordingly, the evaluation of evidence and credibility of witnesses are issues to be determined by the trial court. State v. Smith
(1997), 80 Ohio St.3d 89, 105. An appellate court is to accept the trial court's factual findings unless they are "clearly erroneous." State v. Long (1998), 127 Ohio App.3d 328, 332. In other words, an appellate court must accept the factual determinations of a trial court so long as they are supported by competent and credible evidence. State v. Harris (1994),98 Ohio App.3d 543, 546. The application of the law to those facts, however, is then subject to de novo review. Id.
 {¶ 39} In Miranda, the United States Supreme Court reaffirmed its position that the privilege against self-incrimination protects individuals not only from legal compulsion to testify in a criminal courtroom but, also, from "informal compulsion exerted by law-enforcement officers during in-custody questioning." Id. at 461. "[W]ithout proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." Id. at 467. Accordingly, the Miranda court held that protection of the privilege against self-incrimination during in-custody questioning requires application of special "procedural safeguards." Id. at 444. "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id. Unless a suspect "voluntarily, knowingly and intelligently" waives these rights, any incriminating responses to questioning may not be introduced into evidence in the prosecution's case-in-chief in a subsequent criminal proceeding. Id.
 {¶ 40} As noted previously, the state concedes that defendant was in custody at the time he made the challenged statements. Accordingly, at issue is whether defendant was subjected to an "interrogation" by law enforcement officials without being given the requisite Miranda warnings. Thus, we must consider what "interrogation" means in this context.
 {¶ 41} The Miranda court referred to "interrogation" as actual "questioning initiated by law enforcement officers." Id. The United States Supreme Court later clarified that definition, finding that the goals of the Miranda safeguards could be effectuated if those safeguards extended not only to express questioning, but also to "its functional equivalent." RhodeIsland v. Innis (1980), 446 U.S. 291, 298, 100 S.Ct. 1682. TheInnis court defined the phrase "functional equivalent" of express questioning to include "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." Id. at 301.
 {¶ 42} The Innis court emphasized, however, that theMiranda rules do not prevent the use as evidence of every statement made by an individual in police custody: "`Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. Thefundamental import of the privilege [against self-incrimination]while an individual is in custody is not whether he is allowedto talk to the police without the benefit of warnings andcounsel, but whether he can be interrogated.'" (Emphasis sic). Id. at 299-300, quoting Miranda, at 478. Moreover, the court determined that "`[i]nterrogation,' as conceptualized in theMiranda opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." Id. at 300.
 {¶ 43} Because defendant's motion to suppress challenged all statements made at the police station, a rather detailed review of the court reporter's transcription of the videotape is necessary. That transcript reveals that shortly after defendant arrived at the police station, a detective informed him that it would be necessary to take photographs of the blood on defendant's body. Defendant spontaneously stated "my girlfriend just killed herself." (Dec. 29, 2001, Tr. 31.) The detective told defendant that they would further discuss what happened after defendant was photographed. Immediately thereafter, defendant stated "the only thing that stopped me from killing myself was my daughter." Id. The detective then asked defendant the names of Claire's parents. Defendant reported the names and asked the detective to call them. As his legs were being photographed, defendant spontaneously said, "it's all hers." Id. at 33. The detective inquired, "it's all her blood? Id. at 34. Defendant responded, "[w]hen she shot herself and she dropped to the floor. I * * * couldn't even find a phone." Id.
 {¶ 44} After the detective told defendant to change from the bathrobe he was wearing into jail clothing, defendant stated, "[t]here will be no blood any place in the bathroom except * * *. Id. at 35. The detective then asked defendant if he knew Claire's father's telephone number. Defendant responded that it was in the cell phone police took from him at the scene. After the detective asked defendant for his home telephone number, defendant averred that he did not have a home telephone number because he and Claire always used cell phones. The detective then inquired, "[t]here's not a phone in that place? A wire phone?" Id. at 35-36. Defendant responded, "[t]hat's why I couldn't call anybody faster, I spent 20 minutes running through the house looking for my phone. I couldn't [find] it. I finally found hers." Id. at 35-36. Defendant further stated that he had just purchased a $7,500 diamond engagement ring and that he and Claire were not "having any problems." Id. After defendant mentioned that Claire had three sisters living in Columbus, the detective asked their names, stating "we are just trying to call somebody." Id.
 {¶ 45} A short time later, defendant spontaneously stated, "[d]o everything that you have to do. The only gunpowder on her — she didn't even know the gun was loaded. I had already pulled the clip out. * * * I just wanted to see my daughter." Id. at 37. Defendant continued, "I should have never had guns in the house. * * * I had no problems." Id. at 38. Defendant further stated, "[I wanted to] kill myself right there with her. I just tried to see my daughter first." Id. at 38-39. He continued, "[i]t's all hers — it's all from me trying to find the bullet hole, trying — I didn't ever see her shoot." Id. at 39. Defendant further averred, "[t]here would be more [blood on his body] but I was trying to see my daughter, so I did wash." Id.
 {¶ 46} After the detective ascertained defendant's name, address, and date of birth, he told defendant he would need to ask defendant some questions about the circumstances of Claire's death. Defendant responded that he would fully cooperate. The detective then told defendant that before questioning could commence, he would have to advise defendant of his constitutional rights. Instead of explaining defendant's rights to him, the detective asked defendant about his educational background, whether he had vision or hearing problems, and whether he had consumed any alcohol in the last 24 hours. After defendant responded that he and Claire had consumed alcohol, the detective inquired as to when defendant last had a drink. Defendant answered that he was unsure about the time because after the shooting, he spent 20 minutes looking for Claire's cell phone and trying to perform CPR on her.
 {¶ 47} The detective then asked defendant if he was currently "high" or "buzzed," to which defendant replied, "[o]ther than that, psychologically sound in mind if that is possible. My girlfriend just shot herself. We just bought a house today. We were getting engaged. We were planning our wedding tonight." Id. at 45. When the detective asked defendant if he was on prescription drugs, defendant responded that Claire was "supposed to take Paxil," that she "didn't mean it," and that "[s]he didn't even finish her sentence." Id. at 45.
 {¶ 48} The detective then told defendant he was going to "go over this rights waiver" with him. Id. at 45-46. Defendant interrupted, stating:
I am not of sound mind or — I am not capable of waiving anything right now. I will give you any verbal statement to give you all the information you need to investigate, but I am not going to sign off on anything that has to do with my rights. If you don't want to hear what I have to say, fine. It was my fault for bringing the gun out. But I was in the bathroom by myself when she came in. I was getting the other gun out, and I was taking them out of the house. She had not taken her medication. She was upset about her family and their dislike for me and that she might be pregnant. And beyond that * * * we had no problems. We were out with friends. We were discussing our wedding, and I just lost my whole world.
Id. at 46-47.
 {¶ 49} After this statement, the detective averred, "I understand you don't want to give a statement, but for the record I am going to go over it with you. Who knows, you might change your mind. I am going to advise you of it, okay. * * * I am just going to do the procedure and * * * after that, you can decide on what you are going to do." Id. at 47.
 {¶ 50} Defendant responded, "[y]ou say that I have the right to remain silent. I will be silent. You can get any information that you need for this investigation. Before that. The minute you say it, I have nothing more to say to you." Id.
 {¶ 51} The detective then averred, "I can't ask you anything pertinent to the investigation without me advising you of your rights first. * * * You just mentioned a gun. I don't know if it's more than one gun in the place, stuff like that I need to ask you but —." Id. Defendant interrupted, stating "I am willing to share all this information with you because I have nothing to hide; however, I am not of sound mind. She was in the middle of a sentence when she accidentally shot herself. I feel it was my fault, because she didn't know the gun was loaded. She said, `What do you want me to —' pow. I turned around and she was falling at my feet. I have nothing —." Id. at 47-48.
 {¶ 52} The detective then averred, "I understand. You put me in a corner, because there are questions I need to ask you. When you are saying, she shot herself, I need to know where she shout [sic] herself — * * * I need to know where, you know, the wound is on the body." Id. at 48.
 {¶ 53} Defendant responded:
I couldn't find it. I wanted to put my hands on it. I couldn't find it I tried to give CPR. I tried to hold it. I could feel her jaw, felt like it was broken but I couldn't find the entryway. I couldn't find the exit wound. I just — I just saw blood. * * * I went across the hall, banged on the door and * * * there was nobody home. I finally found a phone, * * * tried to call somebody, got my exwife, because I wanted to see my daughter and tried to clean up myself and just in the hallway before she got there.
We were not having any problems. We were not having any fights. * * * [W]e were discussing the problems with her family and how they felt about the fact that she might be pregnant, and we hadn't actually gotten engaged yet. You can talk to my jeweler and he will tell you that. I had been shopping for a ring to expediate the situation. We were going to the Dominican Republic for two months, starting in January, I was just about to start my new business in Miranova. * * *
Id. at 48-49.
 {¶ 54} The detective then asked defendant if he wanted to help the police with the investigation. Defendant indicated that he would help any way he could, but he did not have an attorney. He further averred that "[w]e just closed on our house today, and I put all of my money in her bank account for that to happen. So I don't have any funds available." Id. at 49-50.
 {¶ 55} The detective assured defendant that an attorney would be provided for him:
"We can call you an attorney. I mean, we wake them up all the time. * * * You know, you don't have to answer any questions right now, and that's fine. But it's two parts to every story. We go by what we see at the scene. Then we just have to process evidence from the scene and take it as that. But she can't tell us what happened, because she is dead. You are the only one that can tell us, and all I want to do is go over your rights, just tell you that you do have the right to remain silent, and anything you say is public in this room. * * * [I]t can be used against you in court."
Id. at 50.
 {¶ 56} To this statement, defendant replied, "* * * [s]top talking right now. Find me someplace where I can be by myself, so I don't have to interact with other people right now until I can see my attorney, and see my daughter * * *." Id. at 50-51.
 {¶ 57} When the detective asked defendant whether he wanted to make a statement about what happened, defendant responded, "* * * I will tell you anything you want to know that will help you in your investigation. But I will tell you nothing that will incriminate me * * * I feel bad enough * * * about owning the gun, she never fired the gun. The very first time in her life she fired a gun she died." Id. at 51.
 {¶ 58} The detective then stated, "[y]ou are saying you will tell me anything. What you are saying is I can ask you questions about what happened? * * * Is that what you are saying?" Id. at 51-52. Defendant replied "I have already told you, I am not of sound mind to make this decision." Id. at 52. The detective again asked "[s]o you don't want to talk to us then? Id. Defendant responded "I don't want to talk to you. I want you to clearly understand what happened." Id. The detective stated "[t]hat's what I want to know. I want it too, because right now I am confused. I am very confused, because it doesn't look like she shot herself to me. I don't know if a burglar came in there. * * *" Id.
 {¶ 59} Defendant responded:
There was no burglar. There was no one in the house but the two of us. We were naked, and we were about to make love, and we were having a discussion about the fact she might be pregnant. * * *. [A]nd I was like "look, your family —" she was talking about how they would respond. I said, "I don't care about that," and she picked up my gun, said, "Well, what do you want me to —" and my back was to her, and she pulled the trigger and fell to the ground by my feet as I turned around, and I can't say anything more than that. If you can find any residue or gun powder on my hands — if you don't find any on hers, then you can come and you can ask me any questions beyond that you want to. Forensics will show you that I did not pull any triggers. There was one shot. The second shot would have been fired. I put the clip in. I was writing a note [to] my daughter, and I had called my wife after I was pretty certain that my girlfriend was dead, my fiancé was dead, and I, at that point, was done. It would have been one second shot had I got to spend time with my daughter before you showed up.
Id. at 52-53.
 {¶ 60} The detective then asked defendant if he wanted the police to call an attorney. Defendant responded that he would not know what attorney he could trust, given the detective's previous statement that it did not look like Claire shot herself. After the detective acknowledged that he had been at the scene, defendant said, "I spent 20 minutes looking through that house. * * * We were packing to move into our house that we had been renovating for a year together." Id. at 54.
 {¶ 61} The detective then averred, "[l]et's try this a different way, Kevin. Since I am restricted on asking you any questions without you being advised, tell me what do you think your constitutional rights are. You know you have a right to remain silent, right? Id. at 54. Defendant answered, "I am not going to address those issues as such in that direction." Id. After the detective stated, "I can't sit here all night and wait for you to volunteer." Id. Defendant said, "* * * put me someplace by myself." The detective responded, "[w]ell, no, you leave here without giving us a statement, without willing to talk to this thing, we converse back and forth with you, you can't go anywhere by yourself. If you leave here, more than likely without giving me a statement, you are going to go to the county until we can sort this out." Id. at 54-55. After defendant said, "[a]nd you already said it didn't look like," the detective replied, "[t]o me, but I don't now the story. That's what I said before, there is two sides to every story. I don't know how she ended up the way she did. I don't know how blood ended up the way it did until somebody tells me. She can't tell me. All I can do is look at the walls, look at the floor, look at the sink where somebody washed up at * * * look at the bathroom where somebody put blood in." Id. at 56.
 {¶ 62} Defendant reiterated that he washed his hands because his daughter was on her way to the apartment, that he wanted to see her, and that he wanted to kill himself. Id. To this statement, the detective replied "[b]ut see that stuff we need to get into it. I can't dwell into that. That statement you just made, I can't dwell into that because you don't want to — you don't want to go over the rights waiver with me. If I dwell into it, you know, I am going to get chewed up for it. So you can say anything you want. You can say, hey, I did this, I did that. But it restricts me from asking you questions." Id. The detective continued, "[w]ell, all I'm saying I can't sit here and babysit you. If you want to give a statement about what happened, we are going to have to go over the rights waiver, and you are going to have to waive your rights to talk to me. If you don't want to do that, it is nothing else I can talk to you about." Id.
 {¶ 63} Defendant responded, "Let me talk to the attorney before I can waive those rights." Id. Thereafter, defendant gave the detective the names of three attorneys to contact. After one of the attorneys arrived at the police station, the detective read defendant his Miranda rights and the rights waiver form. After conferring with counsel, defendant indicated that he understood his rights, refused to waive those rights, and refused to give a statement.
 {¶ 64} Defendant first contends that two of the questions posed by the detective early in the interview were designed to, and in fact did, elicit incriminating responses from defendant that were subsequently used against him at trial. Defendant contends that all statements made by defendant subsequent to these two questions must be suppressed.
 {¶ 65} Defendant points first to the detective's question, "[i]t's all her blood?," to which defendant responded that Claire shot herself and dropped to the floor. Id. at 34. Defendant claims that the state used his response to make a point that defendant was covered in Claire's blood.
 {¶ 66} Immediately prior to the detective's question, defendant voluntarily stated "it's all hers." Id. at 33. The detective's question was thus posed only as a means of clarifying defendant's volunteered statement. Follow-up questions clarifying a defendant's volunteered statement fall beyond the type of questioning Miranda characterizes as interrogation. State v.Tucker (1998), 81 Ohio St.3d 431, 437 (further interaction between defendant and guards "flowed from the initial volunteered incriminating statement").
 {¶ 67} Moreover, even if admission of the statement was error, such error was harmless. See State v. Edgell (1972),30 Ohio St.2d 103, paragraph three of the syllabus. ("The use of a statement against an accused taken in transgression of Miranda
may be found to be harmless error under the rule of Chapman v.California [1967], 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705.") Appellant's answer, that Claire shot herself, was identical to and repetitious of the statement he made at the scene of the shooting before his arrest. Further, laboratory tests performed by the police confirmed that all the blood on defendant's body was Claire's.
 {¶ 68} Defendant next complains that the detective's question "[t]here's not a phone in that place? A wire phone?" amounted to interrogation which elicited an incriminating response from him, that is, that he could not contact anyone sooner than he did because he could not find a telephone. Id. at 35. Defendant contends that the state used his statement in an effort to prove that he lied when he said he could not find a telephone, given that other evidence established that he had access to both Claire's cell phone, which was in the apartment, and two cell phones which were recovered from his vehicle.
 {¶ 69} The detective's question was prompted by defendant's desire to assist in finding the telephone numbers of Claire's parents. When the detective asked defendant if he knew the names of Claire's parents, defendant reported the names and asked the detective to notify them. After defendant reported the name of Claire's father, the detective asked defendant if he knew his telephone number. Defendant said it was in the cell phone police took from him at the scene. At this juncture, the question of defendant's home number came up, undoubtedly because the detective was going to call the apartment and have one of the officers there retrieve the father's telephone number from the cell phone. Because defendant asked the detective to notify Claire's parents, the detective's question was a proper follow-up to that request.
 {¶ 70} Moreover, admission of defendant's statement was harmless. Seevers confirmed that the apartment lacked a wired telephone line. Further, defendant made other statements indicating that he could not find a telephone, including while being transported to the police station and in the note found at the scene.
 {¶ 71} Because we have determined that the statements made by defendant in response to the foregoing two questions need not have been suppressed, we cannot agree with defendant's contention that all statements made by defendant subsequent to these two questions must be suppressed; accordingly, we will not address every statement made by defendant. However, we will address several specific statements that defendant argues resulted from improper interrogation.
 {¶ 72} Defendant complains about the detective's comment that defendant had mentioned a gun and that he needed to ask defendant whether there was more than one gun in the apartment. In response to this comment, defendant stated that Claire accidentally shot herself while she was in the middle of a sentence, and that it was his fault because she did not know the gun was loaded.
 {¶ 73} The detective's comment about the gun was a follow-up to defendant's previous spontaneous statement that it was his fault for bringing out the gun. In addition, we note that in offering the voluntary statement, defendant interrupted the detective's attempt to advise defendant of his Miranda rights. As noted in Miranda, the police need not interrupt a suspect's volunteered statements to give the warnings. Further, admission of defendant's statement was harmless. As we have previously noted, defendant had already stated at the scene that Claire shot herself. Further, defendant's note at the scene indicated that Claire did not know the gun was loaded.
 {¶ 74} Defendant next challenges the detective's question asking defendant where Claire shot herself. In response, defendant gave a long statement, only the first part of which was actually responsive to the detective's question. Defendant contends that the state used his response in an effort to prove that he lied when he said it felt like Claire's jaw was broken, since the deputy coroner testified that Claire sustained soft tissue damage.
 {¶ 75} Although the detective's inquiry constituted express questioning in violation of Miranda, admission of defendant's response was harmless. Although Norton testified that Claire sustained soft tissue damage, he also testified that several of the back teeth on the upper right side of her mouth had been damaged; the state's bloodstain expert concurred. Given this testimony, it is entirely possible that the jury found defendant's assertion that it felt like Claire's jaw was broken to be credible.
 {¶ 76} Defendant challenges several other statements made by defendant on the basis that the state utilized the statements in an attempt to paint defendant as a liar. For example, defendant complains about statements that he purchased a $7,500 engagement ring for Claire, that he wanted to see his daughter, and that he and Claire were planning their wedding. These statements were volunteered by defendant; they were not the product of interrogation. Regarding defendant's statement that Claire was nude, other evidence established that same fact. Indeed, Coulter testified that he found Claire nude on the floor of the bathroom.
 {¶ 77} Defendant also asserts that the prosecution's use of statements made after he requested an attorney violated his right to have counsel present during custodial interrogation. Defendant contends that his statement, "[s]top talking right now * * * until I can see my attorney * * * " constituted an invocation of his right to counsel. Id. at 50-51.
 {¶ 78} In Edwards v. Arizona (1981), 451 U.S. 477,101 S.Ct. 1880, the United States Supreme Court held that law enforcement officers must immediately cease questioning a suspect who has clearly asserted his right to have counsel present during custodial interrogation. A request for counsel must be clear and unequivocal. Davis v. United States (1994), 512 U.S. 452, 459,114 S.Ct. 2350. Defendant's remark is no more an unequivocal request for counsel than Davis', "maybe I should talk to a lawyer." Id. at 455. Further, even if defendant's remark could be construed as an invocation of the right to counsel, admission of the statements following the request was harmless, given that defendant had already made similar statements, or other admissible evidence confirmed those statements.
 {¶ 79} Finally, even assuming, arguendo, that all the statements made by defendant at the police station should have been suppressed, we cannot agree with defendant's contention that he could not have been convicted absent the statements. Other evidence supports defendant's conviction. Claire's cell phone records established a period of 45 minutes after Claire was shot during which defendant did not call the police. During this same period, defendant encountered a neighbor with whom he had a casual conversation, wherein he did not mention the shooting, nor seek the neighbor's aid. The deputy coroner found it unlikely, based upon forensic evidence, that Claire either committed suicide or shot herself accidentally. The state's bloodstain expert opined that Claire's body had been repositioned after she was shot. Finally, defendant's cellmate testified that defendant confessed to him that he murdered Claire. The first assignment of error is not well-taken, and is overruled.
 {¶ 80} By the third assignment of error, defendant contends that the prosecution misused defendant's invocation of his right to silence as evidence of guilt in derogation of Doyle v. Ohio
(1976), 426 U.S. 610, 96 S.Ct. 2240. Specifically, defendant argues that the prosecution improperly commented on defendant's assertion of his right to remain silent by stating in closing argument, "[d]oes a distraught person say, `I'm not psychologically sound of mind?' That is not possible. Are those the statements of an innocent man?" (Vol. XIII, Tr. 1848.)
 {¶ 81} The prosecutor's comment did not invoke the protections enunciated in Doyle. In that case, the United States Supreme Court held that the state may not seek to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving Miranda warnings at the time of his arrest. Here, the prosecutor's comment did not refer to any purported invocation of the right to remain silent. Rather, the prosecutor referenced defendant's statement in an attempt to cast doubt on the theory that defendant was distraught at Claire's death. The third assignment of error is not well-taken, and is overruled.
 {¶ 82} By the second assignment of error, defendant contends that his murder conviction was against the manifest weight of the evidence because evidence of purposeful killing was insufficient.
 {¶ 83} In determining whether a conviction is against the manifest weight of the evidence, an appellate court sits as a "thirteenth juror." As such, it is our obligation to review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of the witnesses to determine "`whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"State v. Thompkins (1997), 78 Ohio St.3d 380, 387. Reversing a conviction as being against the manifest weight of the evidence is one reserved for only the most "`exceptional case in which the evidence weighs heavily against the conviction.'" Id.
 {¶ 84} It is well-established that the weight to be afforded the evidence and the credibility to be given the testimony of the witnesses are issues to be determined by the jury as trier of fact. See State v. Dye (1998), 82 Ohio St.3d 323, 329. As such, the jury is free to believe all, part, or none of the testimony of each witness who appeared before them. Long, supra, at 335. We further acknowledge that the jury was in a much better position than we are to view the witnesses and observe their demeanor, gestures and voice inflections, and use those observations in weighing the credibility of the testimony. SeeMyers v. Garson (1993), 66 Ohio St.3d 610, 615. Thus, we will not second guess the jury on matters of weight and credibility.
 {¶ 85} Although defendant's assignment of error contains the phrase "insufficient evidence of a purposeful killing," defendant concedes that Adams' testimony was sufficient to support the conviction. Defendant instead focuses on a manifest weight review, requesting this court to disregard Adams' testimony in its entirety, given the favorable deal he made with the state in exchange for his testimony, and given Dye's testimony that defendant approached him about testifying against defendant. However, upon review of the record, we conclude that the jury reasonably could have believed Adams' testimony. Adams included details about the crime, about Claire, and about defendant that suggested defendant discussed the crime with Adams. Further, there was no evidence that Adams obtained the information to which he testified from a source other than defendant. With regard to Dye's testimony that Adams approached him and asked him to testify against defendant, Dye admitted that Adams never actually asked Dye to lie about defendant. Dye stated only that the "impression" that Adams wanted him to do so, but never explained what gave him that "impression."
 {¶ 86} Further, other evidence supports defendant's conviction. Defendant was convicted of murder, which is proscribed in R.C. 2903.02: "[n]o person shall purposely cause the death of another * * *." Purpose requires an intention to cause a certain result or to engage in conduct that will cause that result. See R.C. 2901.22(A). "* * * [A]n intent to kill may be presumed where the natural and probable consequence of a wrongful act is to produce death, and such intent may be deduced from all the surrounding circumstances, including the instrument used to produce death, its tendency to destroy life if designed for that purpose, and the manner of inflicting a fatal wound."State v. Robinson (1954), 161 Ohio St. 213, paragraph five of the syllabus. "[A] firearm is an inherently dangerous instrumentality, the use of which is likely to produce death."State v. Seiber (1990), 56 Ohio St.3d 4, 14, quoting State v.Widner (1982), 69 Ohio St.2d 267, 270.
 {¶ 87} In this case, forensic evidence established that Claire was shot in the mouth at close range with a 9mm weapon and that it was unlikely that Claire either committed suicide or shot herself accidentally. From the location of a fresh bruise on Claire's neck and the bullet hole in the bathroom door, the jury could have concluded that Claire had been forcibly held against the door as she was shot. Defendant repositioned Claire's body after she had been shot, as shown by the numerous transfer bloodstain patterns on her body, including several digit patterns, and the fact that the pen used to write the note was found underneath Claire's body. Defendant also washed his hands before the police arrived. Such evidence could reasonably have led the jury to conclude that defendant altered the crime scene in order to conceal evidence that he murdered Claire.
 {¶ 88} In addition, contrary to defendant's claim that he was unable to call police immediately because he could not find a telephone, evidence established that Claire's cell phone was in the apartment and defendant had two cell phones in his vehicle. Even after locating a cell phone, defendant did not call the police. Rather, he made several calls to his ex-wife and tried to reach a friend. Defendant did not call the police even after urged to do so by his ex-wife. From this evidence, the jury was entitled to conclude that defendant did not want to report the matter to the police until he was confident Claire was dead.
 {¶ 89} Finally, the jury had ample reason to doubt defendant's claim to be a distraught, grieving boyfriend. When Kovarik encountered defendant in the hallway approximately one-half hour after Claire was shot, defendant bore no indications that anything was wrong, nor did he ask Kovarik for assistance in calling the police or in aiding Claire.
 {¶ 90} After carefully reviewing the trial record in its entirety, we conclude that there is nothing to indicate that the jury lost its way or that any miscarriage of justice resulted. Consequently, we cannot say that defendant's conviction is against the manifest weight of the evidence. The second assignment of error is not well-taken, and is overruled.
 {¶ 91} By the fourth assignment of error, defendant contends that the trial court abused its discretion in admitting the white shirt into evidence without the state having maintained a proper chain of custody. Defendant also maintains that the probative value of the shirt was substantially outweighed by the danger of unfair prejudice, resulting in the denial of a fair trial to defendant.
 {¶ 92} We begin our analysis with the well-established principle that "[t]he trial court has broad discretion in the admission and exclusion of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, [an appellate] court should be slow to interfere." State v. Hymore (1967), 9 Ohio St.2d 122, 128. An abuse of discretion connotes more than an error of law or judgment; it connotes a decision that was arbitrary, unconscionable, or unreasonable. State v. Adams (1980),62 Ohio St.2d 151, 157.
 {¶ 93} Evid.R. 901(A) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." A "chain of custody" is part of the authentication and identification mandate set forth in the rule and the state has the burden of establishing the chain of custody of a specific piece of evidence before it can be admitted at trial. State v.Brown (1995), 107 Ohio App.3d 194, 200. Although the state bears the burden of establishing a proper chain of custody, that duty is not absolute. State v. Moore (1973), 47 Ohio App.2d 181,183. "A strict chain of custody is not always required in order for physical evidence to be admissible." State v. Wilkins
(1980), 64 Ohio St.2d 382, 389. "The practicalities of proof do not require the state to negate all possibilities of substitution or tampering. The state need only establish that it is reasonably certain that substitution, alteration or tampering did not occur." Moore, supra. A chain of custody may be established by direct testimony or by inference. State v. Conley (1971),32 Ohio App.2d 54, 62. Further, any breaks in the chain of custody do not affect the admissibility of evidence but, rather, the weight to be afforded such evidence. Id.
 {¶ 94} Here, the state established that the police closely guarded the crime scene while it was being processed. Following processing, the locks on the apartment were changed, with only apartment personnel having access to the keys. Those persons permitted access to the apartment before the shirt was discovered denied altering or tampering with the shirt. After Reid discovered the shirt in the clothes hamper, she reported it to Mr. Schneider, who then retrieved the shirt from the apartment. Mr. Schneider then contacted the police, who retrieved the shirt and submitted it to the CPD property room. Mr. Schneider testified that he did not alter the shirt before turning it over to the police.
 {¶ 95} Based on the evidence presented, we find that the state effectively established to a reasonable certainty that no substitution, alteration or tampering of the shirt occurred. Therefore, we find that the trial court did not abuse its discretion by allowing the shirt into evidence.
 {¶ 96} Defendant also contends, pursuant to Evid.R. 403(A), that the trial court erred in admitting the shirt because its probative value was substantially outweighed by the danger of unfair prejudice.
 {¶ 97} Evid.R. 403(A) provides that, "[a]lthough relevant, evidence is not admissible if the probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."
 {¶ 98} Initially, we note that defendant's trial counsel objected to the admission of the shirt only on the ground that the chain of custody was not properly established. Therefore, a reversal on the ground that the shirt was inadmissible under Evid.R. 403(A) is proper only if it was plain error. Plain error is an obvious error that affects a substantial right. It does not exist unless it can be said that, but for the error, the outcome of the trial court clearly would have been otherwise. State v.Yarbrough, 95 Ohio St.3d 227, 2002-Ohio-2126, at ¶ 139.
 {¶ 99} Based upon a review of the entire record, we cannot say the result of the trial would clearly have been different without the admission of the shirt. As we have previously noted, other evidence supports defendant's conviction. The fourth assignment of error is not well taken, and is overruled.
 {¶ 100} By the fifth assignment of error, defendant contends that he was deprived of a fair trial by the prosecutor's misconduct. The test for prosecutorial misconduct is whether the remarks made by the prosection were improper and, if so, whether they prejudicially affected substantial rights of the accused.State v. Smith (1984), 14 Ohio St.3d 13, 14. "The touchstone of analysis `is the fairness of the trial, not the culpability of the prosecutor.'" State v. Loch, Franklin App. No. 02AP-1065, 2003-Ohio-4701, quoting Smith v. Phillips (1982), 455 U.S. 209,219, 102 S.Ct. 940.
 {¶ 101} Defendant's claims of prosecutorial misconduct pertain to the prosecutor's closing arguments. We note initially that defendant failed to object to any of the challenged statements; accordingly, defendant has waived all but plain error. State v. Slagle (1992), 65 Ohio St.3d 597, 604.
 {¶ 102} Prosecutors are afforded wide latitude in closing arguments. State v. Jacks (1989), 63 Ohio App.3d 200, 210. The arguments must be reviewed in their entirely to determine whether the prosecutor's disputed remarks were prejudicial. State v.Mann (1993), 93 Ohio App.3d 301, 312. For a prosecutor's closing argument to be prejudicial, the remarks must be "so inflammatory as to render the jury's decision a product solely of passion and prejudice." State v. Williams (1986), 23 Ohio St.3d 16, 20. Even if a prosecutor's statements during closing arguments are improper, reversal based upon those statements is warranted only if the statements permeate the entire atmosphere of the trial.State v. Tumbleson (1995), 105 Ohio App.3d 693, 699.
 {¶ 103} Defendant first contends that the prosecutor went beyond the evidence in arguing that defendant was concerned that Claire was going to leave him. We disagree. Adams testified that defendant told him that he did not want Claire to go to the Dominican Republic because he felt he might lose her. Although defendant points to other evidence supposedly refuting the prosecutor's argument, it was not misconduct for the prosecutor to focus on evidence favorable to the prosecution.
 {¶ 104} Defendant next contends that the prosecutor improperly vouched for the credibility of the state's bloodstain expert, Robert Young. "It is improper for an attorney to express his or her personal belief or opinion as to the credibility of a witness or as to the guilt of the accused." State v. Williams
(1997), 79 Ohio St.3d 1, 12. In order for the prosecutor to "vouch" for the witness, the prosecutor's statements must imply knowledge of facts outside the record or place the prosecutor's personal credibility at issue. State v. Keene (1998),81 Ohio St.3d 646, 666. Therefore, a prosecutor may argue that certain evidence tends to make a witness more or less credible, but may not state his own belief as to whether a witness is telling the truth. State v. Carpenter (1996), 116 Ohio App.3d 615, 624.
 {¶ 105} Defendant claims that the following comment made during the state's closing argument improperly vouched for the credibility of the state's bloodstain expert, Robert Young:
This is a man with 30 some years of experience as a police officer and 20 some years as a homicide detective. He had absolutely no motivation to lie, no motivation to skew. He got no extra pay for teaching. He was off on sick leave from heart surgery when he did this.
(Vol. XIII, Tr. 1784-1785.)
 {¶ 106} Viewing the prosecutor's closing remarks as to Young's testimony in their entirety, we find that the challenged comment was aimed toward pointing out the strength of Young's testimony based upon evidence and not on the prosecutor's own sense of whether Young was being truthful. Taken in context, this comment was not a basis for reversal. Further, when faced with a similar statement and argument, i.e., the state's witness had "no motive to lie," the Eighth Appellate District stated that there was not a sufficient basis for it to conclude that the prosecutor's conduct was so egregious as to render the trial fundamentally unfair. State v. McGrath, Cuyahoga App. No. 77896, 2002-Ohio-2386. Accordingly, defendant's argument fails.
 {¶ 107} Finally, defendant contends that the following comment improperly denigrated defendant's bloodstain expert: "Stuart James was being paid $175 per hour, and had he agreed with Bob Young's findings, his $175 an hour payday would have stopped as soon as he said I agree." Although it may be proper to discuss an expert's fee to show bias or pecuniary interest, this comment improperly insinuates that James disagreed with Young only so that he could charge additional fees. Even though improper, this isolated remark did not deny defendant a fair trial. The fifth assignment of error is not well taken, and is overruled.
 {¶ 108} Defendant's sixth assignment of error contends that the trial court erred in failing to rule upon his motion to compel the prosecution to provide access to Claire's diary.
 {¶ 109} On February 13, 2002, defendant filed a motion seeking access to certain property seized from the apartment after the shooting. One of the requested items was Claire's diary. On March 5, 2002, defendant filed a motion to compel the state to provide defendant access to the diary. In a decision and entry filed March 8, 2002, the trial court determined that it would review the diary in camera to determine whether it should be provided to the defense. At a pretrial hearing on March 25, 2002, the trial court indicated that it had not yet read the diary. In a February 21, 2003 entry correcting the record, the trial court indicated that it had reviewed the diary, but never ruled on defendant's motion to compel. The court further indicated that it did not recall whether it gave defense counsel an opportunity to review the diary.
 {¶ 110} The failure to rule upon a pretrial motion prior to trial is error. State v. Tolbert (1990), 70 Ohio App.3d 372,388. Such error is harmless, however, unless it adversely affects the substantial rights of the accused. Id.
 {¶ 111} Here, the trial court erred when it failed to rule upon defendant's pretrial motion to compel. The focal issue therefore is whether the trial court's error affected a substantial right of the defendant.
 {¶ 112} Defendant contends that the trial court's failure to provide him access to the diary prejudiced his defense because it corroborated his claim that he and Claire were happy together and were planning to marry. Defendant contends that this evidence refutes the prosecution's theory that Claire was attempting to escape her controlling boyfriend and that defendant killed Claire to prevent her from leaving him. Upon review of the diary, we disagree. The last entry in the diary is dated October 7, 2001, and predates Claire's death by almost three months. Thus, the diary has little probative value regarding the state of their relationship at the time of Claire's death. Further, although some of the entries discuss Claire's love for and desire to marry defendant, including, we note, the last entry, other entries suggest problems in their relationship stemming from defendant's drinking, "mad rage" and self-absorption. Indeed, at least one entry reveals that Claire was ready to go it alone if the time came.
 {¶ 113} Further, in light of the other evidence presented at trial, we cannot say that the trial court's failure to provide defendant access to the diary affected a substantial right of defendant. The sixth assignment of error is not well taken, and is overruled.
 {¶ 114} In his seventh assignment of error, defendant contends that the trial court abused its discretion in failing to grant an evidentiary hearing on defendant's motion for new trial.
 {¶ 115} On July 11, 2002, defendant filed a motion for judgment of acquittal pursuant to Crim.R. 29(C) or, alternatively, for a new trial pursuant to Crim.R. 33. In his memorandum in support of his motion for new trial, defendant contended that Adams "may have acquired certain information about Kevin Tolliver's case as the result of having watched the videotape of Mr. Tolliver's statement to Detective Viduya." (Motion at 11.) Defendant attached no affidavits to the motion, but alleged that counsel was in the process of collecting affidavits and intended to supplement the filing with affidavits in the near future. Defendant "suggest[ed]" that the court set a date for an evidentiary hearing. Id. The trial court denied defendant's motion without a hearing.
 {¶ 116} Crim.R. 33(A) provides in relevant part that, "[a] new trial may be granted * * * for any of the following causes affecting materially his substantial rights: * * * (2) [m]isconduct of the jury, prosecuting attorney, or the witnesses for the state[.]" Crim.R. 33(B) establishes time limitations for the filing of such motions depending upon the grounds asserted. Motions seeking a new trial under Crim.R. 33(A)(2) must be filed within 14 days after the verdict was rendered unless the trial court grants leave to file a motion after the expiration of the time period. To grant leave to file an untimely motion, the trial court must find by clear and convincing proof that the defendant was unavoidably prevented from filing the motion within the 14-day period.
 {¶ 117} The record demonstrates that defendant's motion for new trial was filed on July 11, 2002, 17 days after the June 24, 2002 jury verdict. The record does not reveal that defendant sought leave to file a motion after the expiration of the 14-day time period. Consequently, defendant's motion for new trial was not properly before the trial court.
 {¶ 118} However, even if this fatal defect were not present, defendant has failed to demonstrate that the trial court abused its discretion by either failing to grant an evidentiary hearing or by denying the motion. Pursuant to Crim.R. 33(C), affidavits are required to support a motion alleging grounds under Crim.R. 33(A)(2). As previously mentioned, defendant's counsel never submitted any affidavit to the trial court to support the claim he alleged in the motion. A trial court does not abuse its discretion by denying a motion or a hearing on such motion for new trial on Crim.R. 33(A)(2) grounds if no affidavits are submitted with the motion. Toledo v. Stuart (1983),11 Ohio App.3d 292, 293. Without affidavits, the motion for new trial may be "nothing more than counsel's bare allegations of witness misconduct," and the trial court, under such circumstances, may deny the motion summarily without a hearing. Id. (Emphasis sic.) Here, the motion alleged that Adams "may" have viewed the videotape. The trial court rightly viewed this allegation as "speculative at best." As a result, the motion could be summarily denied. The seventh assignment of error is not well-taken, and is overruled.
 {¶ 119} Defendant argues in his eighth assignment of error that the cumulative effect of the errors in this case denied him a fair trial. "Although a particular error might not constitute prejudicial error in and of itself, a conviction may be reversed if the cumulative effect of the errors deprives the defendant of a fair trial." State v. Fears (1999), 86 Ohio St.3d 329, 348. Upon review of the entire record, we conclude that defendant received a fair trial. The eighth assignment of error is not well taken, and is overruled.
 {¶ 120} For the foregoing reasons, defendant's assignments of error are overruled and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
Bryant and Petree, JJ., concur.