OPINION
{¶ 1} This is an appeal by defendant-appellant, Chris A. Wright, from a judgment of conviction following a jury trial in which appellant was found guilty of aggravated murder, murder, aggravated burglary, aggravated robbery, and kidnapping.
 {¶ 2} In April of 2006, Paula Walker resided at 3269 Eisenhower Road, Columbus. On April 5, 2006, at approximately 9:00 p.m., Walker was alone in her residence watching television in the living room. Walker heard a noise at her backdoor, sounding like someone was attempting to open the storm door. The door was locked, *Page 2 
and as Walker approached the door, she saw "wood popping and screws and nails and so on." (Tr. Vol. II, at 51.) A man was at the door holding a knife, and he demanded money.
 {¶ 3} Walker told the man she did not have any money, but the man pushed her on the floor and stated: "I will kill you, you old bitch." (Tr. Vol. II, at 54.) The man grabbed Walker by the arm and told her to get up. He then demanded Walker's bank card, and told her to get her car keys "because he wanted me to take him to the bank to get some money." (Tr. Vol. II, at 55.) The man first led Walker toward the bedroom, but she stated that her car keys were in the kitchen, so they started walking toward the kitchen. The man was holding the knife to her neck as they walked through the house.
 {¶ 4} At about that time, Walker heard a knock on her door. Walker managed to open the door and her neighbor, Greg Epley, Sr. ("Epley") was standing on the porch. Epley's son, Greg Epley, Jr., was also standing outside. Epley asked Walker whether she was ok, and Walker said "no." (Tr. Vol. II, at 57.) The assailant, who had been standing against a wall in the living room, then ran past Epley and out the door, heading toward Kenworth Street. At that point, Epley took a few steps into Walker's kitchen and fell down on the kitchen floor. He was bleeding profusely from a chest wound. Walker did not observe how Epley sustained his injuries.
 {¶ 5} Walker described her assailant as a black male, approximately six feet tall, weighing 170 pounds. The man was wearing dark clothing, including a dark stocking cap. The knife was approximately 14 inches long.
 {¶ 6} Shortly after police officers arrived, Walker was informed that a suspect had been apprehended. The officers took Walker outside where a man was detained in the *Page 3 
driveway. The man was wearing only boxer shorts. Walker told the officers that the man was her assailant. Walker testified she was "very positive" as to her identification. (Tr. Vol. II, at 68.) At trial, Walker also identified appellant as her assailant. At trial, the state introduced a 911 call placed by Walker on the date of the incident.
 {¶ 7} Greg Epley, Jr. (hereafter "Greg"), age 19, resided at 3275 Eisenhower Road at the time of the incident. On the evening of April 5, 2006, Greg was in his room playing video games when he heard "a loud noise like something being kicked in or something being slammed." (Tr. Vol. II, at 114-115.)
 {¶ 8} Greg ran downstairs to his father's room, which has a window facing Paula Walker's backdoor. Greg's father was sleeping in the room. Greg looked out the window at Walker's residence and observed the blinds shaking. Greg woke up his father and told him he thought someone had broken into Walker's house.
 {¶ 9} Greg's father woke up, put on some clothes, and walked out the front door. Greg's father took a machete with him and walked toward Walker's side door. Greg followed his father. His father knocked on the door, and Walker opened the door. He asked Walker if everything was all right, and she responded, "No." Greg then saw "someone come out onto the porch grab my dad and do a kind of a hug and then my dad yells * * * `he got me.'" (Tr. Vol. II, at 119.) The assailant then let go of Greg's father and took off running toward Kenworth Street. Greg's father attempted to go inside the house but he collapsed.
 {¶ 10} Greg watched the assailant flee, and then went to attend to his father. As Greg was standing outside calling 911, he noticed someone banging on a neighbor's door rapidly. The person banging on the door then entered the house. *Page 4 
 {¶ 11} Police officers arrived a short time later, and Greg pointed toward the neighbor's house. Greg eventually realized his father had been stabbed.
 {¶ 12} Later that evening, police officers asked Greg to look at a suspect. Greg went to the neighbor's driveway and he identified the suspect as the individual who had run out of Walker's house earlier. During the incident, Greg had observed the suspect's face as he was bear hugging his father. Greg testified that he was 100 percent certain that the person he identified that evening was the assailant. Greg also identified appellant at trial as the individual who assaulted his father.
 {¶ 13} In April of 2006, Carl Mason, age 15, resided on Eisenhower Road with his mother, his younger brother, and appellant, his uncle. On the evening of April 5, 2006, Mason arrived home from a friend's house when he heard a sound like glass breaking, and then "saw somebody running down the street." (Tr. Vol. II, at 29.) Mason went into his residence, and appellant "came to the side door and then I let him in." (Tr. Vol. II, at 29.) Appellant came inside, looked out the window, and then went upstairs.
 {¶ 14} A short time later, police officers arrived at the house. The officers told everyone to leave the house. Police officers entered the residence, and they brought appellant out of the house. Appellant was wearing only boxer shorts.
 {¶ 15} On April 5, 2006, Columbus Police Officer Steve Rowlands was dispatched to Eisenhower Street at approximately 9:15 p.m., following a report of a stabbing. Officer Rowlands first spoke with Greg, who informed the officer his father had been stabbed. Officer Rowlands observed the stabbing victim, and realized the wounds were serious. The victim was bleeding profusely from the chest area. *Page 5 
 {¶ 16} Officer Rowlands immediately began questioning individuals at the scene. The victim's son told the officer that a black male had stabbed his father and the suspect had run into the residence across the street.
 {¶ 17} Officer Rowlands immediately went across the street, and by this time other officers had also arrived. Officer Rowlands knocked on the door and a female began to open the door. The woman told the officer "no one is in here." (Tr. Vol. III, at 20.) Nevertheless, the woman allowed the officers to enter the house, and as they approached the stairs they identified themselves as police officers and they heard the response of a man upstairs. The officers went upstairs and took a black male into custody. Officer Rowlands described the man's physical state as "one of rapid heart beat, heavy perspiration, heart palpitations, very nervous and afraid of the situation[.]" (Tr. Vol. III, at 21.) The man was stripped down to boxer shorts, and the officer noticed the suspect had dirt, twigs, and gravel on his legs and chest.
 {¶ 18} Columbus Police Officer James Sheehan was also dispatched to the scene. Officer Sheehan was one of the officers who went to the house where a suspect had reportedly entered. Officer Sheehan found a dark colored jacket in the back of the residence under a window.
 {¶ 19} Columbus Police Detective Michael Castle was dispatched to the scene and took photographs. The jacket recovered by officers contained a black hat, a scarf, a roll of duct tape, and white socks. In the residence where the suspect was arrested, officers found a knife block containing knives. *Page 6 
 {¶ 20} Lafonea Carson resides at 850 East North Broadway, Columbus. Carson's residence is near Eisenhower Road. Several days after the incident, Carson contacted the Columbus Police Department regarding a knife he found in his yard.
 {¶ 21} Columbus Police Officer Deborah Paxton was dispatched to Carson's residence on April 7, 2006, and was told by Carson that he had found a knife in his side yard.
 {¶ 22} Columbus Police Detective James Porter investigated the stabbing, which included interviewing appellant at police headquarters. At trial, the jury heard portions of the taped interview between the detective and appellant.
 {¶ 23} Dr. William A. Cox, a forensic pathologist, conducted an autopsy of the victim, Greg Epley, Sr., on April 7, 2006. The victim suffered two stab wounds. One of the wounds entered the victim's left chest wall, passed through skin and tissue of the left lateral chest wall, and entered the pericardial sac, piercing the left and right ventricles and into the right lung. This wound was fatal. The second wound, which penetrated the skin but not the chest wall, was non-lethal. Dr. Cox opined that the cause of death was "cardiovascular collapse due to hypovolemic shock due to stab wound of left lateral chest wall with perforation of the left and right ventricles and penetration of the right upper lobe." (Tr. Vol. IV, at 85.) Dr. Cox stated that it would be possible for an attacker to cause the type of injury as in this case without getting blood on them.
 {¶ 24} On April 14, 2006, appellant was indicted on one count of aggravated murder, in violation of R.C. 2903.01, one count of murder, in violation of R.C. 2903.02, one count of aggravated burglary, in violation of R.C. 2911.11, one count of aggravated robbery, in violation of R.C. 2911.01, one count of kidnapping, in violation of R.C. *Page 7 2905.01, and one count of felonious assault, in violation of R.C.2903.11. The felonious assault charge was dismissed before trial.
 {¶ 25} The case came for trial before a jury beginning January 2, 2007. The jury returned verdicts finding appellant guilty on all counts. The trial court sentenced appellant by entry filed January 25, 2007. The trial court merged Counts 1 and 2, and sentenced appellant to life without parole on Count 1. The trial court sentenced appellant to a term of imprisonment of ten years on Count 3. The trial court merged Counts 4 and 5, and imposed a sentence of ten years on Count 4, with the sentences on all counts to be served consecutively with each other.
 {¶ 26} On appeal, appellant sets forth the following four assignments of error for this court's review:
 Assignment of Error One
 APPELLANT DID NOT KNOWINGLY, INTELLIGENTLY AND VOLUNTARILY WAIVE HIS RIGHTS TO REMAIN SILENT AND TO HAVE COUNSEL DURING POST-ARREST POLICE INTERROGATION.
 Assignment of Error Two
 APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AND THEREFORE WAS DENIED A FAIR TRIAL.
 Assignment of Error Three
 THERE WAS INSUFFICIENT EVIDENCE FOR THE JURY TO CONVICT THE DEFENDANT HAD THE COURT SUPPRESSED HIS STATEMENTS AND HIS COUNSEL INEFFECTIVENESS THEREBY DENYING HIS RIGHT TO A FAIR TRIAL. *Page 8 
 Assignment of Error Four
 THE VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THE TRIAL COURT ERRED IN FINDING APPELLANT GUILTY. THIS DENIED APPELLANT A FAIR TRIAL AND DUE PROCESS OF LAW AS GUARANTEED BY THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.
 {¶ 27} Appellant's first and second assignments of error are somewhat interrelated and will be addressed together. Under his first assignment of error, appellant argues that he did not voluntarily waive his right to remain silent during a police interrogation. In his second assignment of error, appellant argues he was denied effective assistance of counsel.
 {¶ 28} Under his first assignment of error, appellant challenges the trial court's decision to allow the jury to see and hear the DVD interview between Detective Porter and appellant shortly after appellant was taken into custody. Specifically, appellant claims that he invoked his constitutional right to remain silent, and the trial court should have suppressed the video.
 {¶ 29} The trial court allowed defense counsel the opportunity to make an untimely motion to suppress the interview. After reviewing the recording, the trial court ruled the DVD admissible. Over objection the jury was shown the entire interview from the time appellant was informed of his Miranda rights to the conclusion of Detective Porter's interaction with appellant.
 {¶ 30} We shall address appellant's arguments within the context of the transcript of the interview because in determining whether appellant unambiguously invoked his *Page 9 
right to remain silent, we must consider his words in context. State v.Murphy (2001), 91 Ohio St.3d 516, 520-521.
 {¶ 31} While the detective was asking preliminary questions such as appellant's name and how far he went in school, appellant made the following statement:
 [Q.] Mr. Wright, what is the highest grade you completed?
 [A.] 12th grade. I am trying to — before we go through all this, man, I want to know what I am down here for, man. They come up in my house, man, and drag me up out of the bed, man, they said something about the lady across the street, or whatever. They said — they told me that — they said something about I ran in the house. Okay.
 I said I been up there drinking beer. I am buzzed. Okay. And I am up there drinking, man. They come up there and say — I got my clothes off. I said what did I do? They say nothing. They say just come outside and see if somebody can identify you. If they say no, no problem, you can go back in the house. She said it wasn't me, but I am down here. You know what I'm saying? I have my sister's neighborhood all messed up. I can't go back to my sister's now, you know, because this is disrespected there, man, you know. And now I am down here, I still don't even know why I am down here, and now you got me here sitting here asking me questions about this, and I don't even know why I am down here, man.
 [Q.] Well, I haven't asked any questions about it yet. This is something I have to fill out before I ask you questions.
(Tr. at 5-6.)
 {¶ 32} As can be seen by the passage just quoted, appellant voluntarily asserted a complete lack of knowledge of the events in question before any questioning had ensued.
 {¶ 33} Prior to any questions by Detective Porter (aside from the preliminary questions noted above), appellant was, among other things, advised of his right to remain silent, to have an attorney present during any questioning, and the right to stop answering *Page 10 
questions at any time. When asked if he understood these rights, appellant answered "Uh-huh." (Tr. at 9.)
 {¶ 34} Detective Porter then asked appellant if he wanted to talk about what happened that night. Even though he refused to sign the waiver of rights form, appellant began engaging the detective in conversation. This amounts to an implicit waiver of his rights. "Where a suspect speaks freely to police after acknowledging that he understands his rights, a court may infer that the suspect implicitly waived his rights." (Emphasis sic.) Murphy, at 519.
 {¶ 35} Appellant again expressed confusion about what he was being charged with and asserted that he had been home all day with the exception of going out about three times to get beer and cigarettes. Detective Porter asked for a more specific time frame, and appellant indicated he had been home for a half hour to an hour before the police arrived.
 {¶ 36} Appellant claims that his next interchange was an assertion of his right to remain silent:
 [Q.] Prior to that, you had just been to the store?
 [A.] Yeah, yeah. You know, man, I really don't even want to keep going through these questions and stuff, man, because you all getting ready to charge me with something. I don't know, man. You know what I am saying?
 [Q.] You don't want to answer any more questions?
 [A.] At least tell me what I am charged with, man.
 [Q.] You haven't been charged with anything yet.
 [A.] At least let me know what I am facing, man, because I don't even know. *Page 11 
 [Q.] What you're facing?
 [A.] Yeah.
 [Q.] What you're facing is —
 [A.] I see stuff taped off, I see police everywhere, and I know it is serious. I already know that.
 [Q.] Well, I will be honest with you, Mr. Wright. It is serious. And the odds of you being charged with something, I will be honest with you, are about a hundred percent. So here's what my — you know, what I will say to you. This is your opportunity to tell me your side of what happened. Okay. I am not — I am not here to call you a bad guy or anything. That is not why I am here. I am here to find out what happened.
(Tr. at 13-14.)
 {¶ 37} Appellant argues that he then invoked his right to remain silent again:
 [A.] Man, if it is like that, man, I ain't got nothing to say, man. I ain't got nothing to say. I ain't got nothing to say. Evidently, you're trying to put something on me, man. I ain't got nothing to say. I didn't — I didn't do nothing. I ain't did a thing. I ain't did a thing. I ain't did a thing. I ain't did a thing.
 [Q.] Okay. So you don't want to talk about this anymore?
 [A.] No, not if you're trying to put something on me. You still ain't told me what I did, you know what I'm saying. And I am still answering your questions. You know what I'm saying?
(Tr. at 14-15.)
 {¶ 38} Thus, despite allegedly invoking his right to remain silent, appellant immediately begins speaking again, asserting his innocence, and stating that he was continuing to answer the detective's questions.
 {¶ 39} Appellant then gave an extended narrative both asking what he was being charged with, and explaining what happened when the police arrived. Appellant stated *Page 12 
that the police told him that he was seen running into the house. Detective Porter then asked if appellant did run into the house, and appellant gave another extended narrative of what he had done that day. He concluded by saying, "I don't even know nothing. So, I mean, I really — really have nothing else to say, man. I really don't. (Tr. at 16-17.) Detective Porter then asked, "Do you have any questions for me?" (Tr. at 17.)
 {¶ 40} At that point appellant asked again what the case was about. The detective gave some specifics, and appellant wanted to know why he was being singled out. Detective Porter then asked appellant again if he had any other questions, and appellant stated no, but then repeated his version of what had happened, and denied repeatedly that he had done anything.
 {¶ 41} As can be seen by the quoted passages, appellant never clearly or unequivocally asserted his right to remain silent. He qualified his first alleged invocation by saying "I don't know, man. You know what I'm saying?" (Tr. at 13.) Based on this ambiguous statement, it was reasonable for Detective Porter not to have understood this equivocation as an unambiguous demand to cease questioning. Because appellant's statement was not clear, Detective Porter's clarifying questions, "You don't want to answer any more questions?" and "Okay. So you don't want to talk about this any more?," were not interrogation but rather an indication that the detective was trying to determine if appellant had actually invoked his right to remain silent. See United States v.Lopez-Diaz (C.A.9, 1980), 630 F.2d 661, 665 (clarifying question different from question intended to elicit incriminating statement). *Page 13 
 {¶ 42} In Murphy, supra, at 521, the Ohio Supreme Court held that the statement "I'm ready to quit talking and I'm ready to go home, too" was ambiguous and not a clear invocation of the right to remain silent. (Emphasis sic.)
 {¶ 43} Appellant's decision, for whatever reason, to continue to assert his side of the story, to deny any culpability, and to ask repeatedly what he was being charged with were voluntary statements which are not barred by Miranda v. Arizona (1966), 384 U.S. 436, 478,86 S.Ct. 1602. Detective Porter's follow-up questions do not fall within the purview of interrogation as defined in Miranda. State v.Tolliver, Franklin App. No. 02AP-811, 2004-Ohio-1603, at ¶ 66. The first assignment of error is not well-taken.
 {¶ 44} In his second assignment of error, appellant asserts that he was denied effective assistance of counsel. First, he argues his trial counsel was ineffective for failing to file a motion to suppress the statements appellant made to the police. Second, he claims counsel was ineffective for failing to object to a statement made by Officer Rowlands. Rowlands testified that Greg told him that a black male had stabbed his father and run into the residence across the street. Finally, he argues that his counsel failed to object to a series of questions as to whether Detective Porter had reason to consider any suspects other than appellant. Appellant argues that, in the aggregate, these errors amount to ineffective assistance of counsel.
 {¶ 45} The standard for determining whether trial counsel was ineffective requires a showing that: (1) the trial attorney made errors so egregious that the trial counsel was not functioning as the "counsel" guaranteed under the Sixth Amendment; and (2) the deficient performance prejudiced appellant's defense. Strickland v. Washington (1984),466 U.S. 668, 686-687, 104 S.Ct. 2052; see, also, State v. Bradley (1989), *Page 14 
42 Ohio St.3d 136, paragraphs two and three of the syllabus (adoptingStrickland). Appellant must show that, due to his attorney's ineffectiveness, the proceedings were so unfair that there would be a reasonable probability that the result would have been different absent his attorney's deficient performance. Id., at 693. In reviewing a claim of ineffectiveness of counsel, this court must be highly differential and indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. Id., at 689. In Ohio, a properly licensed attorney is presumed to execute his or her duties in an ethical and competent manner. State v. Hamblin (1988),37 Ohio St.3d 153, 155-156. Debatable strategic and tactical decisions may not form the basis of a claim for ineffectiveness of counsel. State v.Phillips (1995), 74 Ohio St.3d 72, 85. A reviewing court must not use hindsight to second-guess trial strategy, and must bear in mind that different trial counsel will often defend the same case in a different manner. Strickland, at 689; State v. Keenan (1998), 81 Ohio St.3d 133,152.
 {¶ 46} Here, for all the reasons discussed in connection with assignment of error one, appellant's counsel would not have prevailed on a motion to suppress, and, therefore, the belated motion to suppress cannot constitute ineffective assistance of counsel as there is no prejudice to appellant. Most importantly, it was sound trial strategy to allow the recording to be played for the jury. In doing so, defense counsel was able to have the jury hear her client deny his involvement in the crime without his having to face cross-examination or have the jury learn of his criminal record.
 {¶ 47} Appellant next argues that his counsel should have objected to Officer Rowland's testimony that Greg stated that the person who stabbed his father ran into a *Page 15 
house across the street. Appellant contends that counsel should have objected on the grounds that the testimony was both hearsay and factually incorrect.
 {¶ 48} On hearsay grounds, the argument is without merit, as the statement was not offered for the truth, but rather to explain why the officer proceeded directly to the house where appellant was found. SeeState v. Harris, Franklin App. No. 04AP-612, 2005-Ohio-4676, at ¶ 20-21
(statements made over police radio explained conduct of officers in apprehending suspect).
 {¶ 49} As to whether the statement is objectively true, or conflicts with Greg's prior testimony, this is a subject that could have been explored on cross-examination, or argued at closing. Any objection on grounds the statement was untrue would be overruled as going to weight, not admissibility.
 {¶ 50} In choosing not to object to Detective Porter's testimony that other suspects were not considered, we find a lack of prejudice in that the trial court gave a curative instruction that the jury was not to consider the detective's testimony as determining appellant's guilt. We do not find the testimony to be unduly prejudicial so as to violate theStrickland test. In addition, there was overwhelming evidence of guilt given the certain identifications of Paula Walker and Greg of appellant within a very short time of the crimes. In sum, appellant was not denied effective assistance of counsel and the second assignment of error is not well-taken.
 {¶ 51} Appellant's third and fourth assignments of error will be considered jointly. Under these assignments of error, appellant challenges the sufficiency of the evidence in support of his convictions and also contends that the convictions were against the manifest weight of the evidence. *Page 16 
 {¶ 52} We first address the distinction between challenges to the sufficiency and the weight of the evidence. In State v. Wallace, Mahoning App. No. 06 MA 44, 2007-Ohio-6226, at ¶ 14-15, the court noted the distinction as follows:
 Arguments concerning the "sufficiency of the evidence" should not be confused with those addressing the "manifest weight of the evidence." See State v. Thompkins, 78 Ohio St.3d 380, 1997-Ohio-0052, at paragraph two of the syllabus ("The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different.") "Sufficiency of the evidence" is "`a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" Id. at 386, quoting Black's Law Dictionary (6 Ed.1990) 1433. The relevant inquiry when determining whether the evidence is sufficient to support the verdict "is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of facts." Id. at 273. Whether the evidence is legally sufficient is a question of law. Thompkins at 386.
 When reviewing a manifest weight claim, this court's role is to examine whether the evidence produced at trial "attains the high degree of probative force and certainty required of a criminal conviction." State v. Getsy, 84 Ohio St.3d 180, 193, 1998-Ohio-0533. To do this, a reviewing court must sit as the "thirteenth juror" and examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury "`clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Thompkins at 387, quoting State v. Martin (1983) 20 Ohio App.3d 172, 175. "`The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" Id. at 387, quoting Martin at 175. *Page 17 
 {¶ 53} In this case, appellant claims that if the video of appellant's conversation with Detective Rowlands had been suppressed, "there would have been less evidence for the jury to consider." (Appellant's brief, at 15.) Also, appellant claims that the cumulative effect of errors by his counsel resulted in the jury hearing testimony and evidence that prejudiced his right to a fair trial. He incorporates the same arguments into his manifest weight claim.
 {¶ 54} As discussed in connection with assignments of error one and two, appellant was not denied effective assistance of counsel, and the evidence of appellant's guilt was overwhelming. Paula Walker positively identified him as the man who broke into her house and held her at knifepoint. During that time, she had ample time to see him face to face. She also remembered his salt and pepper beard. Greg witnessed his father's murder and positively identified appellant as the man he saw run from the house and put his father in a bear hug. Appellant's appearance when he was confronted by police was not that of a man who had been sleeping or watching television. Rather, the officer's description of his appearance fit a person who had just engaged in strenuous activity. The knife that was recovered a few days later in a neighbor's yard was similar to the set of knives found in appellant's bedroom. The clothing found at the house matched the description of clothing being worn by the assailant.
 {¶ 55} Even if the recorded interview with Detective Porter was excluded from consideration, the evidence was clearly sufficient to support the jury verdict, and weighed heavily in favor of conviction. Therefore, appellant's claim of insufficiency of the evidence and his claim that the verdict was against the manifest weight of the evidence must fail. The third and fourth assignments of error are overruled. *Page 18 
 {¶ 56} Based on the foregoing, appellant's four assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
 McGRATH and TYACK, JJ., concur. *Page 1